Okay, the next argued case is number 18-15-22, Hospira Incorporated against Arnall Pharmaceuticals. Mr. Maddox, when you're ready. May it please the court. Of the three grounds for reversal raised here, one with the most far-reaching implications for end of litigation going forward, I beg your pardon. Of the three grounds presented here, the one with the most far-reaching implications beyond this case is the infringement as a matter of law, the Synovian ruling that the district court made. And we submit that it was erroneous in two ways, but the bottom line is the district court took Synovian where it's never been before and where this court in Farring declined to take it. And that is when the end is silent about the claim and there's not a match, you go on and you treat an end of patentee as you would any other patentee. Prove infringement. Well, it seems that this case doesn't squarely fit with Farring, even if you say it doesn't squarely fit with Synovian. Okay, well, I'm sorry, would you like me to? Yeah, go ahead. Sure, it doesn't squarely fit in Synovian, and I think the judge, as you know, took two steps to get where he ended up. First, he said, I'm gonna take this spec that says 90 to 110% of label strength. And I'm going to interpret that to mean no more than 90%, I'm sorry, no more than 10% decrease in potency at two years as measured by long-term stability testing conditions. And then having done that transformation, which we say was clear error, you look at the text, 90 to 110 is not 90 to 100. If the spec had been 90 to 100, maybe it made sense. But the spec was going for something very different. And when you look at this fax he cited, none of them actually say that. They have their expert reciting 90 to 110, they have their inventor saying, when they were trying to come up with their product, they were shooting for no more than 10%. But no one actually connects how you get from a 90 to 110 of label strength, even over shelf life, from that to no more than 10% decrease, as measured by one of two industry standard tests. But once- But the judge, I mean, this is my point about it. I asked him if this wasn't distinguishable from fairing. I mean, yes, there were some inferences that the court drew from the ANDA itself. But they weren't attenuated. They weren't so far removed as the inferences in fairing. What the court said, and the court did a careful analysis of what the ANDA was pointing to. So I guess I'm trying to understand how you think this is so squarely within Sinovian, or I'm sorry, so squarely within fairing, when I just don't see the comparison between the two. OK, let me ask you just this. Once the court interpreted 90 to 110 to mean no more than 10% after two years, which we do think is a clear error, but I understand you say no. Then you were sort of squarely in fairing land, in that you then had the same parameter decrease, but you had different time points. And the heart of the district court's analysis, once he did that, and this is a quote from A52. He says, look, it becomes clear that a decrease of not more than 10% over 24 months imposes a limitation not just for 24 months, but for all time points less than 24 months as well. That's how he reasoned. And they said, well, since you've got that, this means you would include 2% at five months. If you're 10% at 24 months, this obviously includes 2% at five months. Now, if you recall from fairing, the limitation and the spec they were dealing with there, the limitation was 100% dissolution at 120 minutes. That was the claim. And the spec in fairing was at least 80% dissolution at 60 minutes. And so you could apply the exact same reasoning of the district court to fairing and get the different result. But the difference here is that given the measurements that you used with respect to the stability of the formulations, why wasn't it fair for the court to say, assuming we're using the same measurements that were used in connection with the ANDA? Let's see. I beg your pardon. I mean, what the court said is, I'm only doing exactly what the ANDA did in terms of figuring out how to measure stability. And if I'm using the same measurements that they're using, and this is where I come out, why isn't that inference a fair one? Well, two things. One, it's not the same as used in the ANDA. The ANDA used both in their stability section. And throughout the case, it's been undisputed. You need to use both. The FDA requires you to use both. And everyone uses both. But moving on to where's the fairing problem? Once he's done that, it's here. Because in fairing, he could have written the sentence in fairing. It becomes clear that a specification of at least 80% dissolution at 60 minutes imposes a limitation not just for 60 minutes, but for all the time points greater than 60 minutes as well. If you have a spec that says, you've got to have at least 80% dissolution at 60, you're going to overlap with 100% dissolution at 120, because dissolution doesn't go down. He did an inference that this court, with respect to time point, that this court didn't do. And said, look, time points are silent. You've got to be treated like any other patentee. That's where we see the deviation from fairing. My understanding of fairing was there was a question mark in that product as to what the dissolution rate actually would be over 60 minutes. Even if the ANDA product would meet the third recited dissolution rate for 60 minutes, it was unclear whether the ANDA product was going to have the same dissolution at the other marker points. Here, this ANDA product certainly encompasses a product in which there's no more than 2% concentration loss at 24 months. And so that would necessarily mean it also would be no more than a 2% concentration loss at five months. And if that's true, then this ANDA description encompasses the claimed invention. How does it not encompass the claimed invention? If you accept the transformation, and by the way, You're 90% to 110% requirement, right? If you convert that to Doesn't that encompass losing no more than 2% of the concentration at 24 months? It's a different measure. It's what do you have at the end of 24 months of shelf life, not of testing, not of stability testing. That measure is going to shelf life, which is a different thing. Would it not encompass products that, after 24 months, loses something less than 2% concentration? Is it possible that there is a product that could meet that spec, stay within 90% to 110% of our shelf life, and not lose more than 2% under long-term testing conditions? I don't know. We'd want to see the long-term testing condition results. That's different than where we are at two years. And especially, we'd like to see long-term testing results at five months. I guess I'm trying to understand why is it unreasonable to read your description of 90 to 110 at 24 months as encompassing a product that doesn't lose more than 2% concentration after 24 months? And I'm suggesting it's the same, whether it's reasonable or not, I suppose, it's the same time point inference that this court declined to make. But are you saying, but the district court said that the inference flowed naturally from the ANDA. If you put the ANDA together with the contemplation of the two-year shelf life and the proposed labeling, if you put those three together, the inference flowed naturally from that. Are you saying that in Synovian, there can be zero inference, even if it's completely a logical one? I'm saying, first of all, I don't see how 110 to 90, or 90 to 110, becomes 90 to 110. Because that's really what they're saying. They're saying you take 90 to 110, and you say you can't lose more than 10. Well, if you're going to just ignore the 110 part and just assume you started at 100, and you can't go below 90, I guess that makes sense. But this was not that spec. It wasn't the stability specs are in the stability testing and the stability data, which they couldn't prove infringement on in the end. This is a different animal. But even if you say- I'm still lost, because even under your position, your position is, well, you can't lose more than 20 after two years. But to me, that covers, you can't lose more than two after two years. You can't lose more than? 20%. Right. And then the claim says you can't lose more than 2% at five months tested in one particular test. But just for purposes of this fact pattern, you can't lose more than 20% after 24 months encompasses, you can't lose more than 20% after 24 months. It encompasses a great deal. If it encompasses that, and then why wouldn't that result, you can't lose more than 2% after 24 months, necessarily also encompass you can't lose more than 2% at month five? If we were talking about the same testing, it would encompass that. But the claim is talking about a particular test regime that's used not at two years, it's used at five months. OK, can we go back to my question, and assume for purposes of this question that the inference is a reasonable one. All right? Because when I said, even if the inference is a reasonable one, would you say you can't have any inference under Synovian, and all you did was say, but it's not a reasonable inference. Assume it's a reasonable inference. Are you saying that under Synovian there can be zero opportunity for inferences, even if it's a completely reasonable one? There are two inferences going, and the inference from 90 to 110 to 90, I'm sorry, to more than 10. If that's the inference, that's the inference. I would say it's a question of fact, but there it is. What I'm suggesting is that in Faring, the same reasonable inference was there, and this court didn't take it. Because this court wanted to stay on silence, or you need an actual direct hookup. Otherwise, it can be a slippery slope, and a whole third route to path arrangement and to plaintiffs. I'm sorry. So your answer is, on my question, that you can have zero inferences no matter how logical? No, you can have some inferences, I'm sure. But this court already looked at one particular inference in Fares, and didn't take it, and said, no, you go back to traditional plaintiffs. And that inference was on time point. Because in Faring, just as greater than 80% dissolution at 60 minutes, you could infer that that overlaps with whatever is going to give you the claim of 100% dissolution at 120 minutes, because dissolution doesn't reverse, just as the district court said here. This court said, no, it's silent as to 120 minutes. Go prove your case. I may turn to a definite case. OK. OK to move on? Yes. All right. Let's hear from the other side. Let's hear from the bottom side. Mr. Leiber. Thank you, Your Honor. And may it please the court, I will try to speak up, but I have a very bad head cold, and I The Synovian fits our case to a T, we believe. We believe that the district court's application was straightforward and non-controversial. And let me tell you why. And I want to sort of change the jargon that we've been using. But I think it's helpful to think of the claim limitation in Synovian as a ceiling. The claim specified that an impurity should not exceed the concentration of more than about 2% at five months. The ANDA here, I'm sorry, the ANDA in Synovian sought, I have to start over, Your Honor. I apologize very much. The claim in Synovian specified that the concentration of a contaminant should not exceed 0.25%. The ANDA there sought approval to manufacture a generic version of the drug, but the concentration of the impurity in the ANDA was to be 0.6%. So it was a ceiling. You could not exceed 2% in the case of the claim, 6% in the case of the higher ceiling. The Synovian court found that the ANDA sought approval both for a drug that would infringe under 2.5% and a drug that would not infringe above 2.5%. But that was enough to entitle the patentee to a judgment of infringement as a matter of law. In our case, it's the same. Claim six of the 106 patent is about stability. It sets a ceiling for the loss of the active pharmaceutical ingredient at no more than about 2% at five months. The ANDA seeks approval of a ceiling for a loss of no more than about 10% with a shelf life of 24 months. And when Judge Andrews rationalized the baseline, and Judge Cheney, you were asking about this, rationalized the baseline to fix it so that he could talk about 100% as opposed to 92, 110%, it doesn't make any difference. Because if he hadn't done that, the ask in the ANDA, if you will, the ask for approval would have made the concentration loss even higher. So it would always have encompassed the not more than 2%. But he did rationalize the baseline. It makes it easier to talk about. But it doesn't change the result. Plus, this argument about rationalizing the baseline being here, I don't think that argument was ever made. I think it was waived. But as I say, it doesn't matter if it was waived or not. The outcome is the same. Can you talk about fairing? Because that's what your opposing counsel focused on and pointed out that those were different time points and that our court was unwilling to make certain inferences about other non-disclosed time points in the ANDA having only been offered one time point in the ANDA. And isn't that kind of what we've got going on here? Two different time points. I think it's different. I think Sanovian is a narrow enough case that it can be distinguished from fairing. Sanovian, I don't know. I'm not here to debate how narrow it is. It clearly encompasses the facts in our case. But I think it's narrow enough that it avoids the problem in fairing, or fairing at least as distinguishable as presenting a different problem. The case there involved the modified release of Lysteta. I think that's how it's pronounced. There were three patents. They claimed both ceilings and floors. I talked about ceilings in Sanovian. In fairing, there were ceilings and floors. As you pointed out, the dissolution rate was unclear. So that was a challenge when it came to trying to figure out whether it would meet a ceiling and a floor at the same time in the same patent. And it turned out that the combination of floors and ceilings in the claims, when compared to the single floor that was requested in the ANDA, all the ANDA requested was, I think, a floor of 80% dissolution. At a point in time. It turns out that given the combination of ceiling and floors, and the uncertainty about the dissolution rate, that it just wasn't possible in any one of the three patents to determine whether the approval that was being sought would result in a drug being manufactured that would infringe any of those patents. Required more information. More information than was available on the face of the patent. And so the court there correctly declined to make a finding under the rationale of Synovian. To me... What did Synovian mean, though, when it said that the ANDA has to resolve the question of infringement in the first instance? So I think it means... Pretty strong statement. It's a strong statement, but I think that that's what Judge Andrews did. I think what he did as an example of in the first instance, he specifically found, and this is in the joint appendix as part of his opinion, that at five months, the ANDA sought approval of up to a 10% ceiling of loss. And that is approval for a ceiling of loss of up to 2%, which would include infringement, and it also would include between 2% and 10% loss, which would not be infringing, but that's enough to find infringement under the rationale of Synovian. And... Pardon me one second. He was able to make that finding very straightforwardly because he knows what shelf life means, and he knows that when you promise a shelf life, or you're seeking approval for a shelf life of 24 months, that never exceeds a 10% loss, what that means is that at one month, it will be not more than a 10% loss, at two months, not more than a 10% loss, at three months, not more than a 10% loss, and so on. So when he looks at the five-month time point, he easily sees that what's being sought is approval to manufacture a generic version that will not exceed 10% at five months, and that falls right in the Synovian rule. That's exactly what the case was in Synovian. But the district court acknowledged that at first glance, the measurement of time points specified in the defendant's ANA and the 106 may appear not to read on one another, right? So he... I agree he says that. Started with that. I agree with that. And then he applied a number of inferences to fight infringement, and even if they're logical inferences. But isn't that more like what we said you can't do in Faring than what we said you could do in Synovian? Well, in Faring, you can study, I think, I didn't do it, but I believe from the opinion that's clear that you can study the ANDA until the cows come home, proverbially, and you'll never be able to figure it out. I don't think Judge Andrews had to do a very searching review of the ANDA here. It's very straightforward. If you're asking for approval to manufacture a drug that will not... Where the concentration will not exceed 10% over the shelf life of the drug, you're asking for 10% for every time point along that 24-month period, and that would include at the five-month period. And that's not a difficult thing to figure out. Plus, there was no dispute that shelf life means testing under long-term conditions. I know something was said about the testing conditions. There was no dispute about that. Dr. Yaman, their expert,  would understand that when you're talking about shelf life of a drug that will be administered to a patient, you're talking about testing under long-term conditions, because that's how it's done. That's what it means in this field of art. So the fact that Judge Andrews had to read and think a little should not take this ruling out of the principle of Synovian. He didn't have to do anything that was difficult. He didn't have to do anything that required looking at anything other than the ANDA and the patent. How much more work would it have been to prove infringement as a matter of fact? You just would have had to have a lot more samples, right? Well, the problem was we would have had to have a lot more samples of the allegedly infringing drug. We only had a very small sample set because FDA requires only a very small sample set. And because the FDA requires only a very small sample set, we said that should be enough, because the FDA, after all, is an expert. And if it's enough, if a small sample set- This is a Hatch-Waxman case, but wasn't that the background for how infringement was presented? Well, that's right, Your Honor. I think that Synovian makes particularly good sense in the background of a Hatch-Waxman case because it's not necessarily expected. In fact, it might be considered a routine for infringement not to be challenged because you're copying a drug and you're copying the label of the drug. And it would make sense that it ought to be possible to determine if there's infringement on the face of the ANDA in comparison to the patent claim. So to me, Synovian makes tremendous sense. I don't think we'll have, by affirming Judge Andrews here, I don't think it'll have any far-reaching consequences. In fact, I think most people will just look at that and say, oh, that was an easy call, because I don't think this is a difficult case. I think it falls squarely within Synovian. And we'd ask the court to affirm. I do have a little bit of time left. I'm happy to talk about inherency, but I don't feel the need to talk. But what did the inventors actually invent here? What's their inventive contribution? Well, so. What did they give to the world here? So they figured out a way to make it stable. The problem, that was. They didn't invent the pharmaceutical composition, right? That's not the inventive part. Pharmaceutical composition. That was in the priority. They didn't invent glass containers. That was in the priority. That's correct, yeah. Okay. Where is it? Well, so the 2% limitation, the not more than 2% limitation was not in the priority. That was conceded. That's why, you know, Neil had to try to prove it using the inherency doctrine.  of glass containers that can prevent more than 2% loss of concentration after five months? So I don't think that's right. I think the combination, it wasn't any particular element. Because as you pointed out, the glass and the stopper were in the prior art. What wasn't in the prior art, and this goes to the inherency question, really, what wasn't in the prior art, wasn't shown to be in the prior art, wasn't argued to be in the prior art, are all of the things that were controlled for in example five of the patent. And what I'm talking about is the samples that were presented to the court, to the district court as evidence of inherency were samples that were made in a particular way. And the way in which they were made included the type one glass and the Teflon coated stopper, but also included controlling for the method of fill, including a nitrogen blanket occupying the head space inside the sealed container, and also filtering for, pardon me, filtering for contaminants and controlling the pH. So all of those things. So are you saying that they figured out a way to make it stable, or did you just figure out that it could be stable if properly stored? I guess it would be the latter. They found a way to, and they showed in the patent, and the tests that were used by Amneal and offered to the court to try to prove inherency, they were tests that were, that Hospira itself prepared to demonstrate that Hospira could manufacture a stable four micrograms per milliliter concentration of dexmedetomidine and achieve a 24 month shelf life. That's the invention, I think. And what the inventors accomplished was they found a way where they could reliably do that, and they taught other people how to do it in their patents. That was, that's an invention under our law, and particularly where there was not even a dispute about this question of the 2% limitation being somewhere in the prior. It's not there, it's not in the prior. There was only one route to go, and the route was inherency, and the evidence that they put in to support their argument of inherency fell woefully short of judging this court. There's another district court opinion that recently invalidated this claim, these claims under section 103, right? Yes. And have you filed your notice of appeal yet? We have filed it. Okay. Just hypothetically speaking, an affirmance here wouldn't impact in any way this court's review of that appeal. An affirmance here would not impact the review of that other case, that's correct. Because it's a different record. It's a different record, but... Different party. It's a different party, and that's... I don't think we need to resolve that point here. It's not a simple one. Yeah, I agree with that, it's not a simple one. I think, and I'll leave it at that, Your Honor. I do have some thoughts about it, but I'll leave it at that. And I have a few seconds left. I feel like I'm done unless you have more questions for me. The inherency is really the problem, as to, and your position is that it was not obvious to go to 2%. Turns out the beneficial property is present. Is that right? I think that's a fair statement, Your Honor. I don't mean to be conceding anything, but I'm comfortable saying that. That is our position. They were able to do something that was unexpected. They thought it would be a tremendous challenge going from a high concentration down to this four microgram concentration, which is, in this area of pharmaceuticals, is a very, very, very low concentration. And I think everyone expected that it would not be stable at that concentration. And they were able to solve the problem and come up with a drug that could be sold as a pre-mixed drug with a 24-month shelf life, which was an accomplishment that deserved a patent, in our view. And we would ask the court to affirm Judge Andrews. Anything else? Anything else? Okay, thank you. Brief rebuttal. Yes, Judge O'Malley. With respect to inferences, it's gonna have to be some, I understand, under Sanofi. We suggest that if you're gonna start inferring about science and what this technical thing means and how that converts to what test protocol and so forth, those inferences should be based on actual expert evidence or data, not attorney arguments. Second. So what you're saying is they should have just gotten a lot more samples. No, they could have had their expert witness say, Judge, this, here's how 90 to 110 means less than 110. And here's how this doesn't, this argument was all attorney argument. It was not, there was no expert evidence submitted. There was no scientific evidence. There was nothing. So if there's gonna be inferences from Sanofi, then maybe there should be. They should come, they should require actual scientific evidence to support. Second, it's gonna be something you're wrestling with because in medicines, of course, the court wrote, we don't apply Sanofi and a quote, does not on its face establish infringement. It is a slippery slope once you start opening this up. Where you stop it, obviously is up to you. But the court has been holding back Sanofi and I would suggest for good reason. Lastly, in Ferring, you're holding there or at least what you wrote. You said, here, however, the ANDA does not clearly describe a product that meets the limitations of the asserted claims. That was quoting Sanofi, Ferring quoting Sanofi. And you wrote, rather, the 2010 ANDA is silent with respect to the claim limitations of the patent and suit, which do not specifically, I'm sorry, which do not specify dissolved dissolution rate at 60 minutes. You were calling out the absence of the time point. And then you went on your way. What would you want us to do? If we were to say, okay, this isn't Sanofian, even if it's not Ferring, but we think there needed to be a more developed showing of infringement, do we remand for a new trial on infringement? Well, obviously, I would like you to reverse. But if that is where you come out as you grapple with how Sanofian is going to spread, then I would suggest we have to go back to the court for actual expert evidence, which they should have put in. But how complicated would that expert evidence be? That's my problem. These are just logical inferences. So you just want them to put an expert on to say this is a logical inference? Well, I'd like to be able to have an expert to explain why it's not. And if we're going to make, there are many logical inferences all of us can make about science and be wrong. And so if there's going to be inferences, and if it's not going to be a question of honest face, and if it's not going to be a bright-line rule for Sanofian, which has its own benefits. And remember here, we're not talking about the difference between winning and losing a case. We're talking about whether the end-up patentee gets treated like all other patentees and has to focus on the product that will or likely will be introduced. And that's something the court has been mindful of since the Glaxo case. And that's why Farring said, when you don't have the match, you go to the Glaxo case, which says, come prove your case like anyone else. Now, there are some representations made about their proof at trial. It's in the record, but the judge simply did not credit their expert. And they don't challenge that. It was for them to come up with an expert that they would credit. And if they wanted to, they could have had that expert address the specification, give his opinion as to how it would relate to testing under a specific protocol at five months and so forth and so on. And those would have been in expert reports, and I could have had my experts talk about this and show you, frankly, why it's not true. But to leave it to whatever seems like a logical inference to a non-expert seems to us to be a mistake. I see I'm out of time. Any more questions? Thank you. Thank you both. The case is taken under submission.